Filed 12/23/22  P. v. Ward CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>JOSEPH WARD,<br><br>Defendant and Appellant. | F082046<br><br>(Super. Ct. No. F18905084)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Kristi Culver Kapetan, Judge.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Carlos A. Martinez, Darren K. Indermill and Jeffrey D. Firestone, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

Defendant Joseph Ward was convicted by jury of 12 felony counts related to the assault of victim M. when she was caring for an 18-month-old child while working as a nanny and residing in the home of her employer.  The jury found defendant guilty on two counts of sexual penetration by force (Pen. Code, § 289, subd. (a)(1)(A)[1]; counts 1–2); two counts of assault to commit sexual penetration by force in the commission of a burglary (§§ 220, subd. (b), 460, subd. (a); counts 3–4); first degree residential burglary (§§ 459, 460, subd. (a); count 5); first degree robbery (§§ 211, 212.5, subd. (a); count 6); criminal threats (§ 422; count 7); assault with a deadly weapon, a knife (§ 245, subd. (a)(1); count 8); kidnapping for the purpose of carjacking (§ 209.5, subd. (a); count 9); kidnapping to commit a robbery (§§ 209, subd. (b)(1), 211; count 10); first degree automatic teller machine robbery (§ 211; count 11); and child abuse (§ 273a, subd. (a); count 12).

The jury also found true all special allegations, including that counts 1 and 2 involved aggravating circumstances within the meaning of the "One Strike" law (§ 667.61), and were subject to punishment under section 667.61, subdivision (a); that another person who was not an accomplice was present during the first degree residential burglary, causing it to be a violent felony; that defendant used a deadly weapon with respect to counts 1 through 4, causing those offenses to be serious felonies within the meaning of the "Three Strikes" law (§§ 667, subds. (b)–(i), 1170.12, subds. (a)–(d)); that defendant personally used a deadly weapon within the meaning of section 12022.3, subdivision (a) (counts 1–4); and that defendant used a deadly and dangerous weapon within the meaning of section 12022, subdivision (b)(1) (counts 6, 7, 9–12).

Based on his two prior strike convictions found true by the jury in a bifurcated proceeding, defendant was sentenced as a third-strike offender under the Three Strikes

---

[1]     All further statutory references are to the Penal Code unless indicated otherwise.

law (§ 667, subd. (e)(2)). The court imposed five years determinate (§ 12022, subd. (b)(1); counts 6–7, 9–10, 12), followed by two consecutive terms of 75 years to life under the One Strike law (§§ 289, subd. (a)(1)(A), 667.61, subds. (a), (c), (e)(2), (e)(3); counts 1–2), followed by two consecutive life terms with the possibility of parole (§§ 209, subd. (b)(1), 209.5, subd. (a); counts 9–10), followed by four consecutive terms of 25 years to life (§§ 211, 212.5, subd. (a), 245, subd. (a)(1), 273a, subd. (a), 422; counts 6–8, 12). The terms imposed on counts 3, 4, and 5 were stayed. No sentence was imposed on count 11.[2] Defendant timely appealed.

Defendant claims uncharged-acts evidence was impermissibly admitted under Evidence Code section 1101, subdivision (b), and violated his constitutional rights; his mid-trial motion for self-representation was improperly denied; there is no substantial evidence to support his conviction for kidnapping for the purpose of carjacking under count 9; section 654 applies to counts 10 and 11, and the related punishments should have been stayed; and remand is required so the trial court may have an opportunity to exercise its new discretion under section 654, as amended by Assembly Bill No. 518 (Reg. Sess. 2021–2022) (Assembly Bill 518), with respect to counts 1 through 4.

For the reasons stated below, we affirm the judgment, but remand for resentencing: the court must impose sentence on count 11 and shall exercise its discretion under newly amended section 654 to stay the punishment on *either* count 10 *or* count 11.

---

[2]    When the trial court tallied the aggregate term, it included an additional term of 25 years to life, plus an additional one-year determinate term, ostensibly as the term imposed for count 11 and the attached weapon enhancement (§§ 211, 12022, subd. (b)(1)). However, the court never pronounced sentence on count 11.

## FACTUAL BACKGROUND

### I.     Prosecution's Case

#### A.     June 22, 2018, Attack of M.

At the time of her attack, the victim, M., resided at a home in a Fresno neighborhood where she provided care for a couple's one-year-old child. On the morning of Friday, June 22, 2018, after the couple had left the house, M. took the baby out in a stroller for a walk around 10:00 a.m. On the walk, M. passed a man, whom she later identified as defendant, on the sidewalk; they made eye contact, M. said hello and kept walking; he was wearing basketball shorts, sneakers, a T-shirt and a hat. Thinking nothing of the encounter, M. continued her walk back to the house. As she pushed the stroller up the driveway, she was startled to hear the man from the walk behind her asking for water. When she turned, she told him she had none, and he asked if she had water inside. That made her uncomfortable, so she gave him the water bottle she had on the stroller. She noticed he poured the water into his mouth without touching it to his lips; he gave back the bottle and acted as though he were walking away. She turned toward the house and tried to get to the front door quickly, but discovered he was suddenly standing right behind her. He demanded money and asked whether anyone was home. In an effort to deter him, she told him someone was home, but he kept asking for money. He then showed her he was holding a kitchen knife about 10 inches long in his hand that was wrapped up in a T-shirt. He said if he could borrow her phone, he would leave her alone; when she gave him the phone, he just put it in his pocket.

M. tried to escape into the house, but after a struggle, defendant pushed in behind her and closed and locked the front door. While M. picked the child up from the stroller and tried to comfort the baby, defendant again began asking if anyone was home. M. asked him what he wanted, whether he needed money, and planned to give him her wallet. Defendant, who was holding the knife in his right hand, began acting "skittish"

4.

and saying weird things like he "shouldn't be doing this," and that she had a baby and she was just a kid, too. M. told him to take "whatever."

Although M. was uncertain of the exact sequence of the next few events, while M. was still holding the baby, defendant led her upstairs to get her wallet and her laptop. He grabbed her from the back, demanded she dance for him, and told her he would leave if she did. He was still holding the knife, and she thought he was going to rape her. M. refused to dance, but he said if she did not do so, he would hurt her. She may have run for the back door at this point, although she might have tried to run before he took her upstairs to look for the wallet. In any event, after she attempted to escape out the back door, defendant pulled M. through the kitchen, grabbing a bottle of cooking or olive oil along the way. He dragged her to the living room, demanded she dance and then said he would leave. M. was crying, and defendant kept saying he was not going to rape her, but then he started pulling down her shorts and underwear even though she was still carrying the baby. Defendant had taken a seat on the floor, and made M. get on top of him on her hands and knees facing away from him. He started rubbing oil on the bottom half of her body, and then put his fingers in her vagina and anus. M. tried to focus on comforting the baby whom she was still holding.

Meanwhile, defendant was asking her things like what sexual positions she preferred and demanded that she stop crying or he was going to hurt her. She got up from the floor and tried to run with the baby, but she and the baby fell. Defendant was upset with her and told her she was a bad mom and that she needed to check the baby because he had been a nurse. Defendant next wanted to look for more things to take, so he made them go through the master bedroom. He had M. open drawers because he did not want to touch anything, and he was using the knife to look through things to avoid touching anything. Using a rag, a kitchen towel and/or the T-shirt he had been carrying the knife in, defendant started wiping things down that he had touched. At some point,

5.

he set the knife down or dropped it and was frantic to find it, which he did; M. thought he was trying to trick her into making another attempt to flee.

They went back to the living room, and M. kept telling him that he could take the television and her car. He asked if she had any lingerie, and when M. said no, he said if he found any, he was going to rape her. M. offered her wallet and debit cards; defendant said if he could touch her again, then he would go. He still had the knife, and M. was still carrying the baby. They went back to the living room, and he had her get on her hands and knees just like the first time. He rubbed oil on her once again and digitally penetrated her anally and vaginally, although the second assault was shorter than the first. When M. wanted to stop, defendant started threatening to hurt the baby. M. tried to convince defendant to take them to the bank and she would give him money out of her account; she wanted him out of the house. He agreed that if they went with him to the bank, he would let them go, but he insisted that M. and the baby had to go with him. Defendant warned her not to seek any help along the way, or he would hurt the baby. He told her to put her clothes back on, but he kept her underwear. On her way out the door, she saw her own phone on the floor by the door— she had not seen defendant put it there. At some point, he also showed her his cell phone, which was contained in a brown wallet-like case, and the phone had a black screen.

M. carried the baby while she and defendant walked to her car. The next-door neighbors were outside and waved at her. She tried to mouth to them that she needed help, but they could not see her. Defendant got in the driver's seat, and M. got into the passenger seat with the baby. Defendant still had the knife, along with M.'s laptop, wallet and debit cards. Once in the car, defendant asked her if she had called out to the neighbors and threatened her again. They were going to drive to an ATM, and he demanded she get at least $200 or he was going to hurt her. They drove to M.'s bank at a nearby shopping center, which had an ATM. Defendant warned M. against attempting any escape when she was at the ATM machine. M. thought defendant was behind her

6.

after she exited the car with the baby, but once she withdrew money from the ATM, she discovered defendant was in the car, so M. threw the money and her debt card towards defendant's open window and took off running with the baby. Defendant had wanted M. and the baby to get back in the car so he could drop them off at a park, but once M. got out of the car, she resolved never to get back into it. When M. ran with the baby, defendant drove off in her car.

M. ran inside a store, calling for help. Police officers responded to the store, and M. told them what happened. She tried to describe defendant, but she was in shock and was having difficulty processing what had happened. She described her assailant as a White male, in his 40's, about 170 pounds, bald or balding, wearing a T-shirt and basketball shorts, and shorter than her 5 feet 9 inches height—she estimated he was about 5 feet 6 inches tall. She thought he had been clean shaven, and she could not remember any tattoos. She went to a sexual assault medical examination, and two detectives were there to take her statement. Toxicology reports from the examination later revealed M. had a small amount of methamphetamine in her system that day, a drug she had never used. A toxicologist opined at trial that amount of methamphetamine could be transferred by hand residue that comes into contact with someone else vaginally, rectally, or through a nasal passage or mouth lining.

## B. Police Investigation

By 5:00 p.m. that afternoon, M. was at her family's home when officers showed her some photographs to identify her attacker; she was struggling to process the day's events. Defendant was not among the black and white photos M. was shown, but M. identified one of the men as her attacker. She commented she thought the person she had identified from the photo looked fatter than her attacker, however.

Investigation revealed no physical evidence related to the attacker at the home where M. was assaulted. One of the neighbors who saw M. leaving with defendant and the baby that morning described defendant as a White male in his 20's to early 30's,

7.

medium build; the neighbor had assumed it was M.'s boyfriend. He did not see any kind of knife and did not note a hat or tattoos on the man with M., but he thought the man was carrying the baby. M. did not look at the neighbor or say anything to him as she left, but nothing caused the neighbor any kind of alarm.

Video surveillance in the neighborhood showed M. on her walk with the stroller that morning and a male subject, wearing a hat, and walking behind her. Police showed the video to residents in the neighborhood, and three people thought the male subject looked like Jeffrey N., whose parents lived very close to where the assault occurred, but he was ruled out as a suspect upon further investigation. M. did not identify him when she was shown his photos, and Jeffrey was left-handed while M.'s attacker had wielded the knife in his right hand. At a second photo lineup in June 2018, M. described the suspect to officers as being in his late 40's or 50's with a rough, leather face as though aged from sun exposure, and she did not notice tattoos. Also, M. confirmed the person following her in the video was her attacker.

Police released the video to news broadcasters on July 3, 2018, which resulted in several leads. One person calling in a tip thought the male in the video looked like Ryan G., whose residence was near where M. was assaulted; Ryan's appearance was consistent with M.'s physical description of the suspect, although he had a goatee. Upon questioning Ryan, officers arrested him for unrelated methamphetamine possession. He was cooperative with police, and offered his cell phone so police could verify his whereabouts during the assault. Extracted data from Ryan's phone revealed no contents prior to June 25, 2018, which the extracting officer found odd, but AT&T records showed that phone was in the Pinedale area (an area bordered by Herndon Avenue to the south, Ingram Avenue to the west, Blackstone Avenue to the east) from 6:45 a.m. to approximately 1:50 p.m. on the day of the assault—which is not in close proximity to where the assault occurred. Ryan's girlfriend also said he was with her that day.

Investigators never obtained Ryan's DNA or fingerprints because they had no evidence from M.'s attack with which to compare it.

Another witness had three unspecified interactions with defendant in May and June 2018; when he saw the video of the man following M. pushing the stroller, he was "highly certain" the man was defendant by the way he walked and his body type. He spoke with someone in the district attorney's office about seeing defendant in the video.

The video also prompted defendant's ex-girlfriend Karla R. to contact police and she identified defendant as the man in the video. Investigators questioned Karla at her home, which was searched along with her car. She gave officers clothing defendant left at her house and his red cell phone. The screen on the phone was damaged, and she did not know when that occurred. Although Karla told investigators she had found oil on the steering wheel of her car once when defendant had used it, which she thought might have been a cleaning agent, the search of her car revealed nothing significant. Karla said defendant had tattoos on his leg and on the inside of his forearm. Karla identified Jesse G. as a close friend of defendant and that he stayed with Jesse from time to time. Officers searched Jesse's apartment, but found nothing significant.

From contact with Karla, investigators were also able to ascertain defendant lived with his grandmother and they searched his grandmother's home. A neighbor's video showed defendant's grandmother pulling up to the front door of her house in a car around 12:30 p.m. on the day of the attack, but it never showed when the grandmother had originally left the house. Since the video recorded from 7:00 a.m. to 2:00 p.m., officers assumed the grandmother's car had probably been parked in the back originally. Defendant never appeared in the video, but it did not depict the back door of the house. In a separate surveillance video, M.'s car was seen traveling westbound on West Audubon Drive at 11:38 a.m. on the day of the attack, less than one-half mile from defendant's grandmother's house on West Lexington Avenue and in close proximity to the location where it was discovered abandoned. A neighbor saw M.'s car parked near

her house when she got home around noon on June 22, 2018, and called the police two days later. The car was abandoned less than a mile from defendant's grandmother's house.

M.'s laptop was discovered on the grass in front of some apartments on June 23, 2018, the morning after the assault. No DNA or fingerprints other than M.'s was found inside the car or on the laptop. Data extracted from defendant's cell phone showed that between 9:22 a.m. and 11:34 a.m. on the day of the attack, the phone was either completely out of service or it was turned off. Significantly, there was no location data on the phone for the entire day of June 22, 2018, but there was location data for June 21 and June 23, 2018, leading the investigating officer to opine the phone was turned on other than the window between 9:22 a.m. and 11:34 a.m. on June 22, while the location data option on the phone was turned off just for that one day. This would allow the phone to make the calls that had been made on June 22 without recording any location data.

Just before defendant's phone was turned off at 9:22 a.m. on the morning of the attack, it was near Nees and West Blackstone, in the vicinity of defendant's grandmother's house. Three calls were placed that morning to phone numbers associated with strippers, the last of which occurred at 9:17 a.m. When the phone was turned back on, a call was made to Spice One Entertainment. These calls had been deleted from the cell phone itself, but the data was preserved by the service provider. There were also location data points on the phone indicating the phone had spent the night at an address on West Bluff around May 31, 2018, a location a few doors down from where the victim's car was found abandoned, indicating defendant had recently been to the location where the car was dumped. More data showed that on June 24, 2018, the phone had been in the area close to where M.'s laptop was discovered.

One picture found on defendant's phone was taken on June 13, 2018, and showed defendant and his girlfriend wearing a black and white hat. Another photo taken before

May 21, 2018, showed defendant wearing his hat backwards. The phone itself was unusable when the extraction occurred but, because calls were made from that phone on June 22, 2018, the extracting officer opined the phone was broken after that date.

Meanwhile, on June 24, 2018, defendant and his friend Jesse were involved in a disturbance at Jesse's apartment complex where defendant was wielding a knife wrapped up in a shirt, similar to how M. had described her attacker concealing and holding his knife. A witness to this event identified defendant at trial and testified he had been carrying a large knife wrapped in a T-shirt, which he wielded aggressively toward her and her children on June 24, 2018. Defendant was arrested that same day, but not in relation to the attack on M.

By early July 2018, investigators wanted M. to participate in a live lineup with Ryan and defendant, but defendant refused. As a result, instead of a live lineup, on July 12, 2018, officers presented M. with a color photo lineup of men in their 30's and 40's, including Ryan and defendant, who were all wearing jail clothes and were bald or nearly so, but Ryan had a goatee and defendant had facial hair. M. was emotional while viewing the photographs, and she identified defendant as her attacker. She testified at trial she was cautious about her identification and voiced some initial uncertainty to the investigators because she wanted to be certain she was correct. Two investigating officers indicated that when she had completed the identification, M. started crying, expressed her certainty that defendant was the attacker and begged them not to let him out. She told them the photograph had caused her to have a flashback to the attacker during the encounter. M. looked through defendant's clothing that was taken from Karla's house, but she could not identify any of it.

Police interviewed defendant on July 22, 2018. He said he knew where he was during the time of M.'s attack, but he would not tell them and kept asking investigators where his phone indicated he had been located that day. In a recorded jail call with his grandmother, she indicated defendant was home between 8:00 a.m. and the early

11.

afternoon, and later in the call she said defendant was home between 8:00 a.m. and 12:00 p.m.

At some point, M. heard an interview with defendant on the news. When she heard his voice, she had a flashback to the day of the attack and all the things the man had said to her during the assault. She called investigators and said she recognized the voice of the interviewee on the news as her attacker. M. identified defendant as her attacker at the preliminary hearing in October 2018, and again at trial.

Karla testified at trial that defendant was involved in drugs – he would talk about methamphetamine—and his behavior was strange and paranoid when he was on drugs. She met defendant when she was working as a stripper, and they started going out. Karla identified defendant's black and white hat depicted in a photo from summer 2018, and she thought the hat looked like the hat the man was wearing in the video seen on the news. In the photograph, defendant was clean-shaven and his hair was short. He was wearing black tennis shoes. When she saw the video of the man following M. pushing the stroller, she had called the police and told them to investigate. The silhouette of the man in the video made her think of defendant, but she denied telling officers that it was defendant when she contacted them.

Karla also testified defendant has a series of tattoos, including a wolf on his left leg that was visible when he wore shorts and a tattoo on his right arm that was visible when he wore a short-sleeved shirt. When she gave investigators defendant's cell phone, she thought it was not cracked. She denied telling officers she did not know where defendant was on the day of the attack, but she did remember taking him to the hospital for stomach issues in the very early hours of June 22, 2018, and then taking him to his grandmother's house afterwards. She remembered an incident when the steering wheel of her car was oily and she had asked defendant about it—he claimed he had bought some pizza.

12.

## C.    Uncharged Acts

During the course of the investigation, officers became aware that two women who defendant had hired as strippers/dancers believed he had drugged them with methamphetamine during their encounters with him, and the prosecutor offered the evidence at trial. L.G. testified she was an exotic dancer and worked for a company that scheduled her to dance at people's houses and motel rooms. In February 2018, she went to a hotel to dance for a man she identified as defendant. He offered her extra money to drink a shot of alcohol with him, which she reluctantly did. Then he wanted to give her a massage while rubbing oil on her back and buttocks, and he did so while she was lying on her stomach and he was kneeling behind her; he had brought the oil with him to the motel. She could not recall if he inserted his fingers inside her. The next day, L.G. started hallucinating and she was constantly throwing up, and when it did not subside, she went to the hospital a few days later. Tests at the hospital revealed methamphetamine in her system, but she had never used that drug before.

L.G. had never met defendant before, but she knew who he and his girlfriend were. She did not report the incident to police, although she told her boss about it because she had to call in sick to work after the show. She spoke with law enforcement in August 2018 and told them she had recognized defendant when she saw his picture on the news related to this case. She had talked with other strippers about her experience with defendant; she was concerned something might happen to them.

M.P., a coworker of L.G.'s, testified that in February 2018, she was called to do a show at a motel for a man she identified as defendant. He was acting paranoid when she arrived; he offered her money to take a shot of alcohol he had brought with him. Rather than dancing, he wanted her to kneel, facing away from him, so he could rub baby oil that he had brought with him on her buttocks and thighs. He took his pants off, but kept on his underwear. She could see his legs, but she did not remember any tattoos. He asked to put his fingers inside her, but she refused as she has rules. She was feeling sleepy before

13.

the end of the show, and defendant left early because he got a text message. Defendant texted her later saying he was sorry he left, and offered to pay her for sex.

M.P. drove home with her boss, and she started feeling worse. Someone she knew called an ambulance and the police, and she was taken to the hospital. A blood test at the hospital revealed she had methamphetamine in her system, which was not a drug she normally used. She saw L.G. at the hospital, and they talked about defendant drugging them.

## II.     Defense Evidence

Defense called Ryan's fiancé to testify at trial. She indicated they lived in Pinedale, although sometimes defendant stayed at his mother's house. Ryan had only one cell phone and no tattoos. She spoke with police about this case right after the Fourth of July 2018. Investigators played the video shown to the media, but she did not recognize the man in the video. Ryan had been in and out of the house on the day of the attack; he had gone to the grocery store in the morning; the first time they spoke was in the afternoon. Police found Ryan's black nylon shorts, but she testified that he never wears those out of the house; he has had a goatee since 2017, when they had kids.

Ryan's mother also testified. She denied any memory of talking with officers in July 2018 about her son. She could not recall telling officers she did not know where he was on June 22, 2018. She did not believe the man in the video looked like her son; Ryan never wears basketball shorts in public, and he has not been clean-shaven in 15 years.

Another witness, Glen A., testified he had known Ryan for 23 years, and they had been best friends, but had a failing out in 2013. When he saw the video that was released by the police in 2018, he immediately thought it looked like Ryan, and testified Ryan was the man walking behind M. in the video. Glen's wife also testified she had known Ryan for years, although they had a falling out and she had not seen him since 2015. She testified the man in the video looked like Ryan and that Ryan always wore a baseball hat.

An officer who was involved with the investigation and interview of Ryan testified that during his interview Ryan was unsure where he was on June 22, 2018. Investigators were never able to determine exactly where he was that day. When officers arrested Ryan, there was a second cell phone in his car, which he said was his friend's phone; police were never able to contact the friend and they could not get into the second phone to extract data. Ryan said he had shaved his goatee a few weeks before July 5, 2018, because his kids had been grabbing it. He had black shoes. Nevertheless, Ryan was eventually ruled out as a suspect.

An investigator testified defendant had tattoos on his left shin, his left calf, and on the inside of his right arm from his elbow to his hand.

## DISCUSSION

### I.   Uncharged Acts Evidence

Defendant contends the uncharged-acts evidence was improperly and prejudicially admitted under Evidence Code section 1101, subdivision (b), and deprived him of his Sixth and Fourteenth Amendment rights to due process and a fair trial.

Before jury selection, the prosecution moved to admit, and the defense moved to exclude, evidence related to defendant's two uncharged acts with M.P. and L.G. After a hearing on the in limine motions, the trial court admitted the uncharged-acts evidence because it showed "a common plan, scheme, and it is not unduly prejudicial when balanced against probative value of the evidence.… So, therefore, I'm going to allow it."

#### A.   Legal Standards

Character evidence is generally inadmissible to prove a defendant's conduct on a specific occasion. (Evid. Code, § 1101, subd. (a).) However, uncharged-acts evidence may be offered for a noncharacter purpose, such as "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident .…" (*Id.,* subd. (b).) While uncharged-acts evidence may be relevant for a noncharacter purpose, the evidence may still be excluded under Evidence Code section 352 if its probative value

15.

is "substantially outweighed by the probability that its admission [would] … create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Ibid.*)

On appeal, we review a trial court's ruling under Evidence Code section 1101 and Evidence Code section 352 for an abuse of discretion. (*People v. Thompson* (2016) 1 Cal.5th 1043, 1114, overruled on another ground in *People v. Scott* (2011) 52 Cal.4th 452, 471.) Under this standard, ""“a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.""" (*People v. Jones* (2013) 57 Cal.4th 899, 924; accord, *People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 390.)

### B.     Analysis

Admissibility of uncharged-acts evidence hinges on (1) the materiality of the facts sought to be proved; (2) the tendency of the uncharged crimes to prove or disprove the material fact, i.e., probative value; and (3) the existence of any rule or policy requiring exclusion, i.e., the prejudicial effect. (*People v. Lindberg* (2008) 45 Cal.4th 1, 22.) To be material, the uncharged-acts evidence must be relevant to prove or disprove facts that are either an ultimate fact or an intermediate fact from which such ultimate facts may be proven. (*People v. Thompson* (1980) 27 Cal.3d 303, 315.)

#### 1.     Material as to Identity of M.'s Attacker

Uncharged-acts evidence may be relevant to prove, among other things, the identity of the perpetrator of the charged crimes, the existence of a common design or plan, or the intent with which the perpetrator acted in the commission of the charged crimes. (*People v. Kipp* (1998) 18 Cal.4th 349, 369.) The distinction between the use of evidence of uncharged acts to prove the existence of a common design or plan as opposed to the use of such evidence to prove identity or intent is "subtle but significant." (*People v. Ewoldt* (1994) 7 Cal.4th 380, 394, fn. 2 (*Ewoldt*), superseded by statute on other

grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) Evidence of a common design or plan is relevant and admissible to establish that the defendant committed *the act* alleged. (*Ibid.*) "Unlike evidence used to prove intent, where the act is conceded or assumed, '[i]n proving design, the act is still undetermined .…'" (*Ibid.*) In other words, "'[t]he presence of a design or plan to do or not to do a given act has probative value to show that the act was in fact done or not done.'" (*Id.* at p. 393.) Different from common design or plan, evidence of identity is relevant to prove that the defendant was the perpetrator. (*Id.* at p. 394, fn. 2.)

Here, the court admitted the uncharged-acts evidence as showing a common design or plan, but the jury was instructed to consider it only for the issue of identity, which was the basis the prosecutor sought to admit the evidence and how the prosecutor framed his argument to the jury. "Evidence of a common design or plan … is not used to prove the defendant's intent or identity but rather to prove that the defendant engaged in the conduct alleged to constitute the charged offense." (*Ewoldt, supra*, 7 Cal.4th at p. 394, fn. omitted; see (*People v. Leon* (2015) 61 Cal.4th 569, 597–598 ["the uncharged act must be relevant to prove a fact at issue"].) Regardless of how the trial court characterized the uncharged-acts evidence in admitting it, the identity of M.'s attacker was a disputed and material issue at trial. (*People v. Chism* (2014) 58 Cal.4th 1266, 1307 & fn. 13 [a ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason].) Thus, whether the trial court abused its discretion in admitting the uncharged-acts evidence turns on whether it was significantly probative of an inference of the identity of M.'s attacker and whether, on balance, it was not unduly prejudicial.

### 2.    Significant Probative Value

"For identity to be established, the uncharged [acts] and the charged offense must share common features that are sufficiently distinctive so as to support the inference that the same person committed both acts. [Citation.] 'The pattern and characteristics of the

crimes must be so unusual and distinctive as to be like a signature.'" (*Ewoldt, supra*, 7 Cal.4th at p. 403.) "'The strength of the inference in any case depends upon two factors: (1) the *degree of distinctiveness* of individual shared marks, and (2) the *number* of minimally distinctive shared marks.'" (*People v. Kipp, supra*, 18 Cal.4th at p. 370.) "These common features need not be unique or nearly unique; 'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.'" (*People v. Leon, supra*, 61 Cal.4th at p. 598.)

Defendant argues the uncharged-acts evidence was not sufficiently similar to the charged conduct because defendant's acts with the strippers was voluntary and consensual rather than an unconsented sexual assault at knifepoint as was the case with M. Moreover, while the drugging of the dancers was not consensual, there was no evidence M. was drugged in a similar fashion.

We are unpersuaded these differences detract from the highly distinctive pattern across the uncharged acts and charged offenses. Viewing the evidence in the light most favorable to the trial court's ruling, the charged offenses and uncharged acts displayed common features that revealed a distinctive pattern to support the showing necessary for identity. (*Ewoldt, supra*, 7 Cal.4th at p. 403 [greatest degree of similarity required to be relevant to prove identity—so distinctive as to support inference the same person committed both acts].) Defendant solicited all of the women to dance for him (he hired the strippers to do so, he demanded M. do so); he brought oil with him to the encounters (he brought it to the motel with the strippers, and he grabbed oil from the kitchen before he dragged M. into the living room to assault her). Regardless of whether the women actually ended up dancing, defendant wanted to rub oil on their backsides in the same manner. He positioned all of them facing away from him and rubbed the oil on their buttocks and thighs, but not anywhere else (L.G. was lying on her back while defendant was behind her, and M.P. and M. were positioned identically on hands and knees while defendant was behind them). After rubbing in the oil, defendant sought to digitally

penetrate M.P., but she refused; he digitally penetrated M.'s anus and vagina; and L.G. could not remember if he digitally penetrated her during the encounter.

Defendant offered the strippers extra money to take a shot of alcohol, which they did. Both dancers went to the hospital feeling sick at some point after their respective encounters with defendant and tested positive for methamphetamine, a drug neither of them used. Defendant never had M. drink anything while she was with him, but after her assault, M. tested positive for methamphetamine, a drug she had never used, which the toxicologist testified could have come from a contact transfer, such as from defendant's fingers in M.'s vagina and anus. There was evidence defendant used methamphetamine.

While defendant's method of coercion with M. was a knife and not a spiked drink (as was inferable with the strippers), defendant sought a distinct and particularized sexual experience that he initiated and orchestrated with all three women. None of the conduct was particularly unique in and of itself—dancing as a precursor to other sexual contact, use of an oil/lubricant as part of sexual or sexualized conduct, and digital penetration during sexual encounters/assault are hardly uncommon or distinct when considered singly and generally. It was the distinct way and the order in which these common marks occurred when considered together that shows striking similarity: sexualized dancing as a precursor—whether it happened or not, he paid for it or demanded it from all the women; defendant brought the oil to each encounter, and rubbed the oil on the women's buttocks, thighs (and L.G.'s back) only; he positioned the women similarly during each entire encounter; the use of coercive devices before or during (drugs with the strippers, a knife with M.); and seeking solely digital penetration (M.P. and M.) after the oil was applied. (*People v. Leon, supra*, 61 Cal.4th at p. 598 [common features need not be unique or nearly unique; "'features of substantial but lesser distinctiveness may yield a distinctive combination when considered together'"].)

Moreover, while M. was not a stripper, defendant nonetheless demanded that she dance for him before engaging in the assaultive conduct—distinctive conduct in the

19.

context of a stranger sexual assault—just like with the strippers, and his phone showed calls to strippers in the hours just before he attacked M. The fact that he encountered M. differently than he did the other women, that M. did not willingly engage with him, and that M. had a child with her at the time of the attack do not diminish the points of similarity in the sexual encounter themselves that are highly distinctive in combination. (*People v. Carter* (2005) 36 Cal.4th 1114, 1148 ["To be highly distinctive, the charged crime[] and uncharged [acts] need not be mirror images of each other."], superseded by statute as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107.)

That defendant's conduct with the strippers did not amount to the same offense as that committed against M. does not preclude the existence of similarities sufficient to give rise to an inference of identity. (*People v. Sully* (1991) 53 Cal.3d 1195, 1224–1225 [charged crimes included murder; other-crimes evidence was of imprisonment, rape and assault; common characteristics of illicit sex, use of cocaine and abuse of prostitutes sufficient to support admission on issue of identity and intent]; *People v. Walker* (2006) 139 Cal.App.4th 782, 804–805 [prior conviction for rape sufficiently similar and distinctive to the charged act of murder to be admissible for identity].) Moreover, the uncharged acts were committed mere months before M.'s assault in June 2018. "The close proximity in time of the uncharged offenses to the charged offenses increases the probative value of this evidence." (*People v. Balcom* (1994) 7 Cal.4th 414, 427.)

The similarities between defendant's uncharged acts and the charged offenses were of such distinctive quality when considered in combination as to create a type of signature and, thus, was highly probative of an inference that defendant was M.'s attacker. (*People v. Carter, supra*, 36 Cal.4th at p. 1148 [fatally strangling women and placing the bodies in a bedroom closet established highly distinctive pattern among charged and uncharged offenses probative of identity of perpetrator; differences among the murders went to the weight of the evidence and did not preclude admission of

20.

uncharged offense].)  We find no abuse of discretion in the trial court's conclusion the uncharged-acts evidence was probative and admissible on the issue of identity.

### 3.    Not Unduly Prejudicial

As for prejudicial impact, even if admissible under Evidence Code section 1101, subdivision (b), uncharged acts evidence should be excluded under Evidence Code section 352 if its probative value is substantially outweighed by undue prejudice.  (*People v. Bryant, Smith and Wheeler, supra*, 60 Cal.4th at pp. 406–407.)  As prior acts evidence may be highly inflammatory, it should be admitted only if it has substantial probative value.  (*People v. Jones, supra*, 57 Cal.4th at p. 930.)  A trial court's ruling on this issue is reviewed for abuse of discretion; a court abuses its discretion when its ruling falls outside the bounds of reason.  (*People v. Carter, supra*, 36 Cal.4th at p. 1149.)

We are unpersuaded the uncharged-acts evidence was unduly prejudicial and highly inflammatory as defendant argues.  In evaluating undue prejudice, courts examine such factors as the inflammatory nature of the uncharged conduct; the possibility of confusion of issues; the remoteness in time of the uncharged offenses; and the amount of time involved in introducing and refuting the evidence of uncharged offenses.  (*People v. Hollie* (2010) 180 Cal.App.4th 1262, 1276–1277 [examining prejudicial effect of uncharged acts evidence admitted under Evid. Code, § 1108].)

Uncharged acts evidence can be particularly prejudicial when it does not result in criminal convictions because the jury might be inclined to punish the defendant for the uncharged offenses in the current case.  (*Ewoldt, supra*, 7 Cal.4th at p. 405.)  That risk was significantly diminished here.  The uncharged acts were not as extreme or inflammatory as the evidence related to M.'s assault—the encounters with the strippers were not initiated with a weapon or threats, neither encounter devolved into the type of forced penetration M. endured, nor was any other victim present as was the case with M.  (*Ibid.* [danger of undue prejudice is lessened if evidence of the uncharged acts was "'no more inflammatory than the testimony concerning the charged offenses'"].)  It is unlikely

21.

any reasonable juror would have been inclined to punish defendant for his conduct with the strippers by convicting him of multiple counts involving sexual assault, kidnapping, carjacking, robbery and child endangerment, regardless of his guilt. (*People v. Case, supra*, 5 Cal.5th at p. 41 [jury unlikely to punish uncharged act of soliciting friends to assist in robbery by convicting the defendant of a double robbery-murder].) Finally, as noted, the uncharged acts occurred only months before M.'s attack and, thus, were not at all remote in time to the charged crimes. The strippers' testimony was discrete, uncomplicated, and did not occupy much time at trial.

The trial court did not exceed the bounds of reason in determining the probative value of the uncharged acts evidence was not substantially outweighed by a substantial danger of undue prejudice, confusion of the issues, or misleading the jury. (*People v. Kipp, supra*, 18 Cal.4th at p. 372.) Finding no error under state evidence law, defendant's federal constitutional claim, based on that purported error, fails as well. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1311.)

## II. Denial of Defendant's *Faretta*[3] Motion

Defendant claims the trial court erred in failing to grant his mid-trial *Faretta* motion by improperly assessing the relevant factors and making findings unsupported by the record, resulting in a violation of his federal constitutional rights to personally present his defense and to represent himself.

The People contend the trial court properly considered the relevant factors under *People v. Windham* (1977) 19 Cal.3d 121 (*Windham*), and did not abuse its discretion in denying the untimely *Faretta* motion.

### A. Background

On August 21, 2019, before the jury was present, counsel and the court were reviewing some evidentiary concerns and defendant interrupted to ask whether he could

---

**3** *Faretta v. California* (1975) 422 U.S. 806 (*Faretta*).

speak and make a "Morrisey's hearing" motion. His question was not answered, and the court and counsel continued to go through the evidentiary issue. When they were finished, the court asked whether there was anything else that needed to be taken up and defendant against asked for a "Morrisey hearing." His counsel clarified he wanted a *Marsden*[4] hearing, and the court pointed out there was no *Marsden* hearing available for a defendant who had retained counsel. Defendant explained he was having a dispute with his counsel, and asked for a continuance so he could review the evidence in his case, which the court refused.

Defendant then asked how he could stop his attorney from proceeding as she wished with his defense and the court explained, "I would have to allow you to fire her at this stage of the proceedings, because it's gone on for over a year and we're this far into the process and I would have to declare a mistrial and start over, because this is the first I've heard of you wanting to get rid of your counsel. So at this point I'm not going to grant your request and your counsel is going to continue to represent you as she has done thus far and ably."

After a break, the court attempted to reaffirm that defendant wanted to relieve his retained counsel, to which defendant responded he was confused because he had not had a chance to talk with his counsel at the break. The court asked whether defendant had another attorney ready to immediately take over since the prosecution was nearly finished with its case. The court explained if defendant did not have anyone in mind, then it would be "an incredible disservice to the system of justice" and it would cause delay.

After some additional discussion about his conflicts with his lawyer (including that defendant had never wanted a jury trial, his lawyer had misled experts, and he had not seen any evidence in the case), the court again asked whether he had other counsel who could step in right away. Defendant represented he could "get counsel" but he did

---

**4**     *People v. Marsden* (1970) 2 Cal.3d 118.

not know whether "they'll be ready to continue with the trial." The court indicated it was unwilling to grant a continuance and that "[a]t this point we're going to go ahead and proceed with counsel that you have, and she's able and she's been doing a fine job." Defendant responded that he was not going to get a good defense, and the court granted a recess so that defendant could speak with his counsel.

Two days later, on Friday, August 23, 2019, defendant again wanted to "address [his] attorney situation" and said he "wanted to go pro per" and have his "attorney be second." Defendant indicated he had exculpatory evidence and he wanted to recall the prosecution's toxicology expert. The court noted it had previously denied defendant's request to substitute different counsel and denied defendant's request to represent himself. Defendant was directed to speak with his counsel about the exculpatory evidence, which he had not apparently done yet.[5] The court allowed defendant time to discuss the issues with his counsel.

After a break, the trial court clarified the reasons for denying defendant's request to represent himself:

> "Prior to the break [defendant] requested to represent himself. I will note for the record that I denied it. The basis of the record is the quality of the representation thus far appears to be good. [Defense counsel] has done a good job presenting evidence and cross-examining witnesses thus far. [Defendant] has previously tried to substitute his counsel out on more than one occasion; however, in the home court, when [his counsel] was attempting to get out of the case, [defendant] didn't want that. And now he does. The proceedings, as I've stated before, are well underway and the People are just reopening to play one tape at this point, so it's a late stage of the proceedings and it would likely cause disruption and delay. And finally, the conduct of the defendant in court gives the Court reason to believe that if he was allowed to represent himself, he may cause a disruption in the proceedings as he's already done so. Even though I had warned him at the beginning of the proceedings not to speak out, he has.

---

[5] Defendant asked the court how he could "get evidence in that [he] want[s]"; the court directed him to speak through his counsel, and defendant asked "[w]hat if she tells me no?"

24.

And so based upon all those factors, I'm denying the request to represent himself."

## B.    Legal Standards

A criminal defendant has a federal constitutional right to represent himself if he voluntarily and intelligently so chooses.  (*Faretta, supra*, 422 U.S. at p. 832).)  "A trial court must grant a defendant's request for self-representation if the defendant unequivocally asserts that right within a reasonable time prior to the commencement of trial, and makes his request voluntarily, knowingly, and intelligently.  [Citations.]  As the high court has stated, however, '*Faretta* itself and later cases have made clear that the right of self-representation is not absolute.'  [Citations.]  Thus, a *Faretta* motion may be denied if the defendant is not competent to represent himself [citation], is disruptive in the courtroom or engages in misconduct outside the courtroom that 'seriously threatens the core integrity of the trial' [citations], or the motion is made for purpose of delay [citation]."  (*People v. Lynch* (2010) 50 Cal.4th 693, 721–722 (*Lynch*), overruled on other grounds in *People v. McKinnon* (2011) 52 Cal.4th 610, 637.)

"If a self-representation motion is untimely, however, it is 'within the sound discretion of the trial court to determine whether such a defendant may dismiss counsel and proceed *pro se*.'"  (*People v. Johnson* (2019) 8 Cal.5th 475, 499 (*Johnson*), quoting *Windham, supra*, 19 Cal.3d at p. 124.)  As noted in *Johnson*, our Supreme Court has held on numerous occasions that *Faretta* motions made on the eve of trial are untimely.  (*Johnson, supra*, at p. 499; see, e.g., *Lynch, supra*, 50 Cal.4th at p. 722.)  The *Faretta* right is "not absolute if not exercised until the eve of, or after the onset of, trial."  (*People v. Bloom* (2022) 12 Cal.5th 1008, 1057–1058.)  "[O]nce a defendant has chosen to proceed to trial represented by counsel, demands by such defendant that he be permitted to discharge his attorney and assume the defense himself shall be addressed to the sound discretion of the court."  (*Windham, supra*, at p. 128.)

In evaluating an untimely mid-trial request for self-representation, "a court may consider not only 'the potential for delay and disruption' but also 'whether the potential disruption is likely to be aggravated, mitigated, or justified by the surrounding circumstances, including the quality of counsel's representation to that point, the reasons the defendant gives for the request, and the defendant's proclivity for substituting counsel.'" (*People v. Bloom, supra*, 12 Cal.5th at p. 1058, quoting *People v. Buenrostro* (2018) 6 Cal.5th 367, 426; accord *Windham, supra*, 19 Cal.3d at p. 128.)

### C.    Analysis

Defendant's *Faretta* motion, brought at the close of the prosecution's case, was unquestionably untimely.  In this circumstance, we review the trial court's denial of the motion for an abuse of discretion.  (*Johnson, supra*, 8 Cal.5th at p. 499.)  "[A] trial court does not abuse its discretion unless its decision is so irrational or arbitrary that no reasonable person could agree with it." (*People v. Carmony* (2004) 33 Cal.4th 367, 377.)

One of the relevant factors the court considered was defendant's prior conduct that left the court with serious concerns about defendant's ability to comport himself appropriately during the proceedings.  (*People v. Welch* (1999) 20 Cal.4th 701, 735 (*Welch*) [no abuse of discretion in denying *Faretta* motion based on the defendant's disruptive behavior in the courtroom].)  The record supports the trial court's reasoning in this regard.  Before the jury was sworn, defendant had interrupted the motions in limine hearing to pose questions mid-argument, for which he was admonished and was directed to speak through his counsel rather than in spontaneous outbursts during the proceedings.  And, while defendant attempts to minimize his subsequent trial conduct, he also engaged in a substantial series of outbursts in front of the jury before he made his *Faretta* motion.

During the direct examination of his former girlfriend, Karla, defendant yelled out, "I love you too, Karla."  In an apparent attempt to ignore the disruption, the prosecutor's questioning continued, but defendant again interrupted by exclaiming, "You guys can't do this.  This is not me."  The court interjected:  "Okay, stop it.  If you speak again, I'm

going to have you leave the courtroom." Rather than complying, defendant then asked, "May I speak?" The court responded, "No, you may not," which defendant disregarded by exclaiming, "I didn't do this." The questioning of Karla resumed.

At the end of Karla's cross-examination, defendant again interrupted the proceedings by calling out, "Your Honor" to which the court interrupted him and told him "No." Defendant tried again: "Can I just—" but the court interrupted him again and told him "[n]o." After the jury had been excused, defendant was admonished again about outbursts.

A defendant who demonstrates he is unwilling or unable to abide by the rules of procedure and courtroom protocol threatens the viable functioning of the courtroom. (*Welch, supra*, 20 Cal.4th at pp. 734–735.) A disruptive defendant who represents himself and therefore cannot be removed from the trial proceedings as a sanction against disruption has the capacity "to bring his trial to a standstill." (*Id.* at p. 734.) A trial court "possesses much discretion" when it comes to deciding whether a defendant's untimely motion for self-representation should be granted in view of disruptive, obstreperous, disobedient, disrespectful or obstructionist behavior. (*Id.* at p. 735.) This broad discretion is for good reason: only the trial judge is in a position to assess the tone and demeanor that accompanied these outbursts. (*Ibid.*) Defendant's outbursts were not just demonstrated during court proceedings out of the jury's presence, as was the case in *Welch*, but he interrupted witness testimony during trial and, even after admonishment, continued to argue with the trial judge in front of the jury. Defendant's conduct was a highly relevant consideration in denying his *Faretta* motion, and the record supports the trial court's reasoning in this regard.

The trial court also weighed the delay and general disruption to the proceedings defendant's motion would create. This factor generally accompanies any untimely motion for self-representation, but this was an especially untimely *Faretta* motion made near the end of the prosecution's case that had the potential to lengthen the trial and, thus,

disturb trial estimates resulting in potential hardship to jurors and impact the court's calendar. (See *People v. Jackson* (2009) 45 Cal.4th 662, 690 [*Faretta* motion made after a full day of jury voir dire and at the tail end of preliminary jury instructions found disruptive to the orderly presentation of a capital case].)

The trial court considered defendant's proclivity to substitute counsel even though, in the court's observation, defense counsel was quite ably representing defendant during trial. Defendant had, on Wednesday, August 21, 2019, asked the court to relieve him of his counsel because of disputes with her over trial tactics, representing he was talking with other attorneys. That motion was denied because defendant had no lawyer prepared to take over immediately. When defendant could not resolve the issues with his counsel, he took a different tactic on Friday, August 23, 2019, and asked to be relieved of counsel altogether under *Faretta*. This demonstrated some proclivity to vacillate with respect to representation by counsel, and suggested defendant made the *Faretta* motion out of frustration at having his substitution request denied rather than a genuine desire to represent himself. (*People v. Jenkins* (2000) 22 Cal.4th 900, 961–962 (*Jenkins*) [one prior motion for self-representation evidence to support trial court's finding in denying second motion for self-representation that the defendant had a proclivity to substitute counsel when he was unhappy with the way things were going].)

Moreover, the trial court also noted defendant and his counsel had been at loggerheads before. Defense counsel had made a motion to withdraw about three months before trial (May 2019), indicating defendant had complained to the court at a hearing a few days earlier about the ways he felt his counsel was failing him. In her motion to withdraw, citing unreasonable difficulty in conducting effective representation, counsel noted defendant had repeatedly disregarded counsel's advisements and had thwarted the preparation of his defense. At the hearing on counsel's motion, defendant nonetheless stressed that he wished to keep his retained counsel, despite his prior complaints, and the motion to withdraw was denied. This, too, supports the trial court's finding defendant

had a proclivity to vacillate with respect to his representation by counsel when he was unhappy.

Defendant asserts he never asked for a continuance in making his motion and that where no continuance accompanies a request under *Faretta*, a denial of the motion is unjustifiable. Not so. In *Jenkins*, the defendant made a second *Faretta* motion after the jury was selected and the prosecutor had delivered an opening statement, which the trial court denied. (*Jenkins, supra*, 22 Cal.4th at p. 961.) Although the defendant had not requested a continuance (which the trial court considered the only factor militating in the defendant's favor), the high court nonetheless affirmed and noted "[t]he circumstance that [the] defendant did not seek a continuance is not determinative." (*Id.* at p. 963.)

As in *Jenkins*, the trial court here could reasonably conclude defendant was well represented by counsel, he had some proclivity to vacillate with respect to representation by counsel, granting the motion at that stage of trial would disrupt the orderly presentation of the trial, and that defendant's behavior posed the risk he would disrupt the proceedings if accorded pro se status. The trial court entertained the reasons defendant wished to represent himself, which centered on disputes with counsel over strategy and the presentation of evidence, but pointed to the extreme untimeliness of defendant's motion and noted defense counsel's good-quality representation. In sum, the trial court considered the appropriate factors, and there is evidence in the record for the findings made in support of those factors. The trial court did not abuse its discretion in denying defendant's untimely *Faretta* motion.

III. **Sufficiency of the Evidence: Kidnapping for Purposes of Carjacking**

Defendant argues the evidence is insufficient to support his conviction on count 9 for kidnapping for purposes of carjacking. The People dispute defendant is entitled to any relief in this regard.

"The Due Process Clause of the Fourteenth Amendment denies States the power to deprive the accused of liberty unless the prosecution proves beyond a reasonable doubt

29.

every element of the charged offense" (*Carella v. California* (1989) 491 U.S. 263, 265, citing *In re Winship* (1970) 397 U.S. 358, 364), and the verdict must be supported by substantial evidence (*People v. Zamudio* (2008) 43 Cal.4th 327, 357 (*Zamudio*)).  On appeal, the relevant inquiry governing a challenge to the sufficiency of the evidence "'is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1055.)  "The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt."  (*Zamudio, supra*, at p. 357.)

"In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence."  (*Zamudio, supra*, 43 Cal.4th at p. 357.)  "'[I]t is the jury, not the appellate court which must be convinced of the defendant's guilt ….'"  (*People v. Nguyen, supra*, 61 Cal.4th at pp. 1055–1056.)  "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict" (*Zamudio, supra*, at p. 357), but "speculation, supposition and suspicion are patently insufficient to support an inference of fact" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 951; accord, *People v. Marshall* (1997) 15 Cal.4th 1, 35; *People v. Xiong* (2013) 215 Cal.App.4th 1259, 1268).

A.     Analysis

Section 215 defines "'Carjacking'" as the "taking of a motor vehicle in the possession of another, from his or her person or immediate presence … against his or her will and with the intent to either permanently or temporarily deprive the person in possession of the motor vehicle of his or her possession, accomplished by means of force or fear."  (*Id.,* subd. (a).)  Section 209.5 provides that a kidnapping in the commission of

a carjacking occurs when "[a]ny person who, during the commission of a carjacking *and in order to facilitate the commission of the carjacking*, kidnaps another person who is not a principal in the commission of the carjacking .…" (*Id.,* subd. (a), italics added.)

"The intent that the kidnapping facilitate the carjacking must be present when the original asportation began." (*People v. Ortiz* (2012) 208 Cal.App.4th 1354, 1365.) "[I]f there is substantial evidence that [the defendant] intended the kidnapping to effect an escape or prevent an alarm from being sounded, his conviction for kidnapping during the commission of a carjacking must stand." (*People v. Perez* (2000) 84 Cal.App.4th 856, 861.) This is so even if there are other concurrent intents for the kidnapping. (*People v. Ortiz, supra*, at p. 1366.) Specific intent must often be inferred from circumstantial evidence as "[d]irect evidence of the mental state of the accused is rarely available except through his or her testimony." (*People v. Beeman* (1984) 35 Cal.3d 547, 558.)

Defendant argues the evidence supports only that he kidnapped M. to facilitate the robbery at the ATM, not that he intended to kidnap M. to facilitate the carjacking. Rather, defendant maintains, the carjacking was merely an incidental means to transport M. to commit the robbery at the ATM.

Contrary to defendant's argument, there was ample evidence defendant knew kidnapping M. was absolutely essential to facilitating the carjacking by preventing M. from sounding any alarm. Once defendant had sexually assaulted M. twice and had rifled through the house and stolen various items, the jury could reasonably infer defendant needed M.'s car to escape the scene quickly. The evidence indicated defendant showed up on foot and that M. knew he was on foot—she saw him walking when she took the baby out in the stroller, and he was on foot near the driveway when she encountered him the second time. From this, she had reason to believe, as did the jury, that defendant did not have a vehicle nearby. Indeed, in subsequent attempts to get defendant to leave, M. kept telling him that he could take her car. Moreover, based on M.'s offer of her car, defendant had reason to know that *she* knew he was otherwise on foot.

31.

The evidence also indicated defendant thought M. was in her own home—he followed her to what he assumed was her house: he had asked her if anyone else was home, and she had her wallet and personal items in the house. Since this was M.'s residence and defendant knew it, the jury could reasonably infer defendant knew M. would know quick means of summoning help through electronic devices, landline telephones, and neighbors. This was why defendant had taken M.'s cell phone right at the outset of the attack. The jury could reasonably infer defendant was worried about M. calling for help, and he was aware that the minute she was left in her own home alone, she was going be able to summon police assistance in short order.

Moreover, not only would M. likely be able to quickly secure help once defendant left the house, defendant was aware M. would have no problem describing to law enforcement what car he was driving since it was hers. Even if he were to leave her in the house restrained (or worse), he would have no idea when someone would get home and alert law enforcement. Defendant had demonstrated he was keenly aware of the need to prevent M. from getting any help from the time he accosted her in the driveway and took her cell phone until he forced her to leave with him in the car and warned her against calling out to anyone. When M. attempted to lure defendant out of the house and offered the additional incentive of money from her bank, it was reasonably inferable that defendant insisted, by violent threat, that M. get in the car with him with the intent to take the car and prevent her from sounding any alarm; there was evidence to conclude he did not kidnap M. solely for the purpose of subsequently robbing her at the ATM. To make his escape from the house, defendant needed the car, and to escape in the car, he needed M. in it.

M. testified she thought defendant wanted her back in the car *after* she got money from the ATM, as she believed he was planning to drop her off at a park. This was additional evidence from which to infer defendant kidnapped M. to prevent her from seeking any help. In fact, the jury had substantial evidence to infer defendant's *primary*

32.

objective in kidnapping M. was to facilitate taking her car and to prevent her from calling for help, and that the ATM robbery was seen by defendant as just an added bonus while he was effectuating his escape in the car. The prosecutor pointed to both theories in closing arguments: defendant kidnapped M. with two separate objectives. There was substantial evidence defendant intended to kidnap M. specifically to facilitate the carjacking separate from the objective to kidnap M. to get her money at the ATM.

## IV. Section 654

Defendant claims counts 9 (kidnapping for carjacking; § 209.5, subd. (a)), 10 (kidnapping for robbery; § 209, subd. (b)), and 11 (first degree ATM robbery; § 211) were committed with the same intent and objective to get M. to the ATM to withdraw money. Thus, he maintains section 654 should apply to the punishment on counts 9 and 11.

### A. Legal Standard

Section 654, subdivision (a), provides in relevant part as follows: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Section 654 precludes multiple punishments not only for a single act, but for an indivisible course of conduct. (*People v. Hester* (2000) 22 Cal.4th 290, 294.)

Determining "[w]hether a defendant may be subjected to multiple punishment under section 654 requires a two-step inquiry .…" (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) "We first consider if the different crimes were completed by a 'single physical act.' [Citation.] If so, the defendant may not be punished more than once for that act. Only if we conclude that the case involves more than a single act—i.e., a course of conduct—do we then consider whether that course of conduct reflects a single "'intent and objective'" or multiple intents and objectives." (*Ibid.*)

"It is [the] defendant's intent and objective, not the temporal proximity of his offenses, which determine whether the transaction is indivisible. [Citations.] We have traditionally observed that if all of the offenses were merely incidental to, or were the means of accomplishing or facilitating one objective, [the] defendant may be found to have harbored a single intent and therefore may be punished only once. [Citation.] [¶] If, on the other hand, [the] defendant harbored 'multiple criminal objectives,' which were independent of and not merely incidental to each other, he may be punished for each statutory violation committed in pursuit of each objective, 'even though the violations shared common acts or were parts of an otherwise indivisible course of conduct.'" (*People v. Harrison* (1989) 48 Cal.3d 321, 335 (*Harrison*).) Even where a defendant has similar but consecutive objectives, multiple punishments are permitted. (*People v. Latimer* (1993) 5 Cal.4th 1203, 1211–1212.)

"The question of whether the defendant held multiple criminal objectives is one of fact for the trial court, and, if supported by any substantial evidence, its finding will be upheld on appeal." (*People v. Herrera* (1999) 70 Cal.App.4th 1456, 1466, disapproved on another ground in *People v. Mesa* (2012) 54 Cal.4th 191, 199; accord, *People v. Moseley* (2008) 164 Cal.App.4th 1598, 1603.) "When a trial court sentences a defendant to separate terms without making an express finding the defendant entertained separate objectives, the trial court is deemed to have made an implied finding each offense had a separate objective." (*People v. Islas* (2012) 210 Cal.App.4th 116, 129.) Here, the trial court made no express findings with respect to the application of section 654 as to these counts.

### B. Analysis

This case does not involve a single physical act; therefore, we focus on the second step of the analysis governing section 654: whether the crimes were a "'course of conduct deemed to be indivisible in time.'" (*Harrison, supra*, 48 Cal.3d at p. 335, quoting *People v. Beamon* (1973) 8 Cal.3d 625, 639; accord, *People v. Corpening, supra*,

2 Cal.5th at p. 311.)  Generally, "'"[w]hether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the intent and objective of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one."'" (*People v. Capistrano* (2014) 59 Cal.4th 830, 885, overruled in part on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 103–104.)

However, "'[b]ecause of the many differing circumstances wherein criminal conduct involving multiple violations may be deemed to arise out of an "act or omission," there can be no universal construction which directs the proper application of section 654 in every instance.'"  (*People v. Hicks* (2017) 17 Cal.App.5th 496, 514, quoting *People v. Beamon, supra*, 8 Cal.3d at p. 636; accord, *Harrison, supra*, 48 Cal.3d at p. 336.)  Section 654 "is intended to ensure that [the] defendant is punished 'commensurate with his culpability'" (*Harrison, supra*, at p. 335), and the California Supreme Court has cautioned that "such a 'broad and amorphous' view of the single 'intent' or 'objective' needed to trigger the statute would impermissibly 'reward the defendant who has the greater criminal ambition with a lesser punishment'" (*id.* at pp. 335–336, quoting *People v. Perez* (1979) 23 Cal.3d 545, 552–553).

There was substantial evidence the kidnapping for carjacking (count 9) and the kidnapping for robbery (count 10) were committed pursuant to two very distinct and separate objectives and intents.  As explained above, there was evidence defendant needed the car to make his escape—he was not going to be able to leave M. in the house and simply walk away on foot.  Even in the car, defendant still needed M. to accompany him because if he merely drove away in her car, she would quickly be able to sound the alarm and she would be able to very specifically describe what car he was driving to police.  He also wanted more cash, as M. had convinced him they could get money out of an ATM.  To accomplish that robbery, logically, he needed M. along both to ensure a correct PIN code at the ATM and to avoid any cameras at the machine.  There was

substantial evidence that M. was kidnapped for two distinct objectives and intents: to facilitate the carjacking and defendant's escape *and*, separately, to kidnap her to accomplish the robbery at the ATM.

As for whether there were separate objectives to commit the offense of kidnapping for robbery (count 10) and the robbery at the ATM (count 11), defendant argues the two offenses were committed under one single objective: to commit the robbery. The People take no substantive position on the application of section 654 with respect to counts 10 and 11 and instead argue the issue is moot because the trial court failed to impose any sentence on count 11. The People suggest the abstract of judgment, which incorrectly reflects a term of 25 years to life was imposed for count 11, should be amended to omit any sentence imposed on count 11.

With respect to counts 10 and 11, the evidence and reasonable inferences therefrom indicate defendant kidnapped M. to commit a robbery at the ATM, and when they reached the ATM in the car, he forced her to get out and obtain the money, which she did. These two crimes were committed pursuant to the same intent and objective: to rob M. at the ATM. (*People v. Beamon, supra*, 8 Cal.3d at p. 639 [conviction of kidnapping for purpose of robbery and for commission of that very robbery were committed pursuant to single purpose and objective].)

The punishment imposed on count 10 was life with the possibility of parole. (§ 209, subd. (b)(1).) The trial court did not impose any punishment for the conviction of first degree robbery under count 11, which we cannot overlook as the People suggest. (*People v. Duff* (2010) 50 Cal.4th 787, 796 ["when a court determines that a conviction falls within the meaning of section 654, it is necessary to *impose* sentence but to stay the *execution* of that duplicative sentence"]; see *People v. Vizcarra* (2015) 236 Cal.App.4th 422, 432 [failure to pronounce sentence on statutory sentence enhancement allegation or strike enhancement results in unauthorized sentence].) First degree robbery is punishable by a determinate term of two, three or five years. Attached to count 11, the jury also

found true the weapon enhancement allegation under section 12022, subdivision (b)(1).
Because defendant was sentenced as a third-strike offender, and first degree robbery with
a weapon enhancement under section 12022, subdivision (b)(1), is a serious felony under
section 1192.7, subdivision (c)(23), the applicable punishment is 25 years to life under
section 667, subdivision (e)(2)(A)(ii), plus an additional year for the enhancement.

While the aggregate term the court pronounced at sentencing appears to include a
term of 25 years to life, plus a one-year term enhancement under count 11, no term was
actually imposed on count 11—the aggregate total articulated by the trial court does not
match what was orally pronounced.  The case must be remanded for the trial court to
impose sentence on count 11, regardless of whether the sentence imposed is then stayed
under section 654.  Moreover, effective January 1, 2022, section 654 has been amended
under Assembly Bill 518 and now allows the trial court discretion to select to stay the
punishment for *either* count 10 or count 11.  (§ 654, subd. (a) [act or omission punishable
in different ways by different provisions of law may be punished under either such
provisions, but not both].)[6]  Assembly Bill 518 applies retroactively to nonfinal cases
such as this one.  (*People v. Sek* (2022) 74 Cal.App.5th 657, 673.)  Remand is required so
the trial court may impose a sentence on count 11 and determine, under newly amended
section 654, subdivision (a), which punishment under either count 10 or count 11 shall be
stayed.

## V.    Assembly Bill 518

At the time defendant was sentenced (and when the offenses were committed),
section 654 provided that when an act or omission was "punishable in different ways by
different provisions of law," the trial court was required to punish the defendant "under

---

**6**    At the time defendant was sentenced, section 654, subdivision (a), provided that where an
act or omission is punishable in different ways by different provisions of law "shall be punished
under the provision that provides for the longest potential term of imprisonment .…"  (§ 654,
former subd. (a).)

37.

the provision that provide[d] for the longest potential term of imprisonment." (§ 654, former subd. (a).) The statute was amended, however, effective January 1, 2022, by Assembly Bill 518 "to afford sentencing courts the discretion to punish the act or omission under either provision," without regard to the longest potential term of imprisonment. (*People v. Mani* (2022) 74 Cal.App.5th 343, 351.)

Here, counts 1 and 2, sexual penetration by force (§ 289, subd. (a)(1)(A)), and counts 3 and 4, assault to commit sexual penetration by force during the commission of a burglary (§§ 220, subd. (b), 460, subd. (a)) were based on the same two incidents of sexual assault.[7] The trial court sentenced defendant to 75 years to life for counts 1 and 2, and stayed the life terms under counts 3 and 4 pursuant to section 654. Defendant maintains Assembly Bill 518 applies retroactively to the judgment in his case. According to defendant, since amended section 654 now allows the trial court discretion to impose the lesser punishment on counts 3 and 4 while staying the greater punishment for counts 1 and 2, the matter should be remanded for the court to determine whether to exercise this new discretion.

The People correctly concede Assembly Bill 518 applies retroactively (*People v. Mani, supra*, 74 Cal.App.5th at pp. 379–380) but, relying on *People v. Caparaz* (2022) 80 Cal.App.5th 669, 689–690 (*Caparaz*), review denied (Sept. 28, 2022), they argue the punishments imposed on counts 1 and 2 are mandated under section 667.61, subdivision (h) (section 667.61(h) or § 667.61(h)), of the One Strike law and cannot be stayed regardless of retroactive application of Assembly Bill 518.

In reply, defendant argues *Caparaz* was wrongly decided. According to defendant, section 654 is very broadly worded and does not eliminate the One Strike law from its purview. Section 667.61(h) does not expressly preclude application of

---

[7] The court also stayed the punishment on count 5 for first degree residential burglary, ostensibly in relation to count 6 for first degree robbery. As both counts 5 and 6 were subject to the same punishment, application of amended section 654, subdivision (a), would have no effect.

38.

section 654; had the Legislature meant to do so, defendant contends, it would have done so expressly as it did in precluding application of section 1385 to dismiss or strike any allegation, admission or finding of any of the aggravating circumstances under the statute. (§ 667.61, subd. (g).) Moreover, defendant notes, section 667.61(h) does not mention the word "'stay,'" it says "nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." According to defendant, the *suspended* wording is commensurate with the terminology used in the probation context, to which section 667.61(h) expressly refers; section 667.61(h) should not be interpreted to limit the effect of newly amended section 654.

Section 667.61(h) provides, "Notwithstanding any other law, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, a person who is subject to punishment under this section." We agree with *Caparaz*'s reasoning and conclusion that the plain meaning of this statute prohibits application of section 654 to One Strike offenses. Generally, when a defendant is convicted of two offenses for which section 654 prohibits multiple punishment (as here), the trial court imposes sentence for one of them, and then imposes and stays the sentence for the other offense. (*People v. Mani, supra*, 74 Cal.App.5th at p. 380.) A stay is a type of suspension. (*Caparaz, supra*, 80 Cal.App.5th at p. 689, quoting *People v. Santana* (1986) 182 Cal.App.3d 185, 190 ["'A stay is a temporary suspension of a procedure in a case [until the happening of a defined contingency].'"].) Although application of section 654 is typically referred to as a "stay," there is no apparent cognizable difference between a "stay" and a "suspension" of execution of sentence. Indeed, it would be oddly incongruent to read section 667.61(h) as permitting a *stay* of execution of sentence under section 654 while barring a *suspension* of execution of sentence. To interpret section 667.61(h)'s language "nor shall the execution or imposition of sentence be suspended for" as referring to and prohibiting only *probation* for One Strike offenses, and nothing more, renders that phrase meaningless as the statute already expressly prohibits

39.

granting probation for One Strike offenses.  (*Caparaz, supra*, at p. 689, citing *People v. Hudson* (2006) 38 Cal.4th 1002, 1010 [generally, courts must give significance, if possible, to every word or phrase in a statute and avoid a construction that makes some words surplusage].)

Moreover, while section 667.61(h) does not expressly prohibit application of section 654, its phrase "[n]otwithstanding any other law," is typically understood as signaling the Legislature's intention the statute is to prevail over all contrary law—which would include section 654.  (*Caparaz, supra*, 80 Cal.App.5th at p. 689, quoting *In re Greg F.* (2012) 55 Cal.4th 393, 406 ["'When the Legislature intends for a statute to prevail over all contrary law, it typically signals this intent by using phrases like "notwithstanding any other law" or "notwithstanding other provisions of law."'"].)

The People's interpretation, that section 667.61(h) precludes application of section 654 to One Strike offenses, best comports with the plain meaning of section 667.61(h)'s language, it does not render any words mere surplusage, and it serves the purpose of the One Strike law, which is to "'increase the penalties imposed on defendants who commit certain sexual offenses under specified circumstances.'" (*Caparaz, supra*, 80 Cal.App.5th at p. 689, quoting *People v. Betts* (2020) 55 Cal.App.5th 294, 299.)  Remand under Assembly Bill 518 to consider application of section 654 as to counts 1 through 4 is unnecessary.

## DISPOSITION

The matter is remanded for resentencing so that the court may impose a sentence on count 11 and then elect which punishment (either that for count 10 or count 11) to stay

under section 654. Following resentencing, the trial court shall forward the amended abstract of judgment to the appropriate authorities. The judgment is otherwise affirmed.


                                                          MEEHAN, J.

WE CONCUR:


LEVY, Acting P. J.


FRANSON, J.